IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| WAYNE PERANK and MONICA NEBEKER,<br><br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT<br><br>Case No. 2:20-cv-00712-JNP-CMR<br><br>District Judge Jill N. Parrish |

The United States replaced an open-air irrigation canal with a pressurized, underground pipe in order to prevent water loss through seepage and evaporation. Plaintiffs Wayne Perank and Monica Nebeker sued the government under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680, alleging that the implementation of this project temporarily prevented them from irrigating their properties, damaging their crops and forage grass. Perank also alleged that the contractor that performed the work damaged his irrigation infrastructure located on his property.

Before the court is the government's motion for summary judgment. ECF No. 83. It argues that the plaintiffs cannot prevail on their claims for damages caused by the temporary loss of access to water for two reasons: (1) the court lacks jurisdiction over these claims due to the discretionary function exception to the FTCA and (2) the United States retained immunity from liability under the FTCA because a private party could not be held liable under similar circumstances. The United States also contends that it is not liable for damage to Perank's private irrigation infrastructure because an independent contractor caused the harm. The court GRANTS the motion for summary

judgment. The court lacks jurisdiction to hear the loss of water claim due to the discretionary function exception. And the United States is not liable for damage to Perank's irrigation infrastructure caused by an independent contractor.

## BACKGROUND[1]

Over a century ago, Congress appropriated funds to construct the Pahcease Canal, which diverted water from the Duchesne River for the benefit of members of the Ute Indian Tribe of the Uintah and Ouray Reservation. Indian Department Appropriation Act of 1906, ch. 3504, 34 Stat. 325, 375–76. The United States created the Uintah Indian Irrigation Project (UIIP) to administer this irrigation system. The Bureau of Indian Affairs (BIA) oversees the UIIP. Individuals who had a right to receive water from the Pahcease Canal were required to pay maintenance fees to the BIA to fund the continuing operation of the UIIP. *See* 25 C.F.R. § 171.500. For tribal member allotments, these fees are collected from the Ute Indian Tribe. In 2000, the BIA transferred the

---

[1] In the introduction to the "Background and Facts" section of its motion for summary judgment, the United States represented:

> The United States' defenses listed above are primarily issues of law that require few supporting facts. Nonetheless, the following facts are presented to provide background and context for the discussion of legal issues. The only undisputed material facts are the facts regarding the status of the independent construction contractor, Excavation Services.

The United States subsequently listed 59 paragraphs of facts supported by citations to the record. Seizing on the government's statement that the only undisputed facts related to the status of the contractor, the plaintiffs argue that the above-quoted language amounts to a concession that all other facts asserted by the United States—i.e., paragraphs 1–24 and 30–59—are disputed. The court disagrees with the plaintiffs. Notwithstanding the government's inartful statements in its motion, the United States listed facts supported by citations to the record that are relevant to its legal arguments. The burden then shifted to the plaintiffs to cite record evidence showing that the asserted facts were disputed. *See* FED R. CIV. P. 56(c)(1)(B). The court recites the facts of this case by resolving all proper disputes of fact in the plaintiffs' favor.

responsibility of operating and maintaining the UIIP irrigation system to the UIIP Operation and Maintenance Company (O&M).

Perank holds a tribal assignment to about 200 acres of land. His assignment includes a Class 1 water right for 97.05 acres. Perank used his water right to flood irrigate crops of alfalfa and oats. Nebeker holds a 40-acre tribal assignment of land, which comes with a Class 1 water right for 12 of those acres. Nebeker used her allotment of water to promote the growth of natural grasses to provide forage for her horses.

In early 2015, a group of farmers within the UIIP approached the United States Department of Agriculture Natural Resources Conservation Service (NRCS), requesting that the Pahcease Canal be converted to a buried pipeline to prevent loss of water through seepage and evaporation. This proposal was subsequently approved and funded. The NRCS, in consultation with the BIA and the O&M, designed a pipeline that would provide water to the properties served by the Pahcease Canal. The plan called for construction of the Pahcease Pipeline in two phases. Phase 1 involved the installation of the main pipeline. Phase 2 involved the construction of three pipes, called "laterals," that would branch off from the main pipeline and deliver water to individual users. In the later part of 2015, the O&M accepted a bid from a private contractor, Excavation Services, Inc., to perform Phase 1 and Phase 2 of the project.

The irrigation season for the area serviced by the Pahcease Canal runs from mid-April to mid-October. The pipeline installation plan called for Phase 1 and Phase 2 to be completed before the start of the 2016 irrigation season. In October 2015, Excavation Services began work on Phase 1, replacing a portion of the canal with buried pipe. This early work on the project cut off the canal from its diversion point. Sometime after the project began, the BIA halted construction pending the endorsement of a Memorandum of Agreement concerning the project by the Ute Indian Tribe.

After the tribe signed the document on March 16, 2016, Excavation Services renewed work on the project.

Because of the delay caused by the BIA's decision to interrupt construction pending the tribe's endorsement of the Memorandum of Agreement, Excavation Services did not have enough time to finish both Phase 1 and Phase 2 before the 2016 irrigation season began in mid-April. And because the work performed by Excavation Services in late 2015 had severed the Pahcease Canal from its source, the BIA could not delay the pipeline project until after the 2016 irrigation season. Accordingly, the O&M accelerated Phase 1 construction, and postponed Phase 2 until the end of the irrigation season.  Excavation Services completed the main pipeline in mid-April 2016.

Because the laterals had not been completed, Nebeker received no water during the 2016 irrigation season. The BIA and NRCS designed a stop-gap solution to deliver water to Perank during 2016. The BIA left in place a portion of the Pahcease Canal and lateral ditches that served Perank's allotments and installed a valve on the main pipeline that could release water into the canal. The valve was in place on April 16, 2016. But on April 18, 2016, Perank informed the BIA that this interim measure was not delivering sufficient amounts of water to irrigate his land. The BIA relayed this information to the O&M, which instructed Excavation Services to order and install 1,800 feet of temporary pipe that would deliver water from the main pipeline to Perank's property. The modification was completed on May 13, 2016. But the temporary pipe delivered an adequate flow of water for only a short period of time before dropping to a small stream. This inadequate supply of water prevented Perank from employing his gravity-flow irrigation method, resulting in crop water stress, a limited harvest, and damage to his alfalfa stands.

Excavation Services began work on Phase 2 in March 2017. But construction was put on hold after Perank claimed that the laterals designed by the BIA would not provide enough water.

4

The BIA agreed to modify the plans to accommodate Perank's request, which delayed completion of Phase 2. Construction of the laterals servicing Perank's allotment were finished on May 20, 2017. Perank began taking water from the laterals in the first week of June.

During the installation of the laterals, Excavation Services removed structures and filled in ditches that had transported water on Perank's property. These improvements were part of his privately owned on-farm infrastructure.

Perank and Nebeker sued "the United States, Bureau of Indian Affairs," asserting a single claim for negligence under the FTCA. They claimed that the government's negligent implementation of the pipeline project prevented them from receiving their allotment of water, damaging their crops and forage grass. Perank also alleged that the United States was liable for damage to his on-farm irrigation infrastructure. The government moved for summary judgment on the plaintiffs' negligence claim.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In considering whether a genuine dispute of material fact exists, the court must determine whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). The court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

I.  **DISCRETIONARY FUNCTION EXCEPTION**

The plaintiffs bring a claim of negligence against the United States under the FTCA. The government argues that this court lacks jurisdiction over a portion of this cause of action. It maintains that the plaintiffs' claim that the United States negligently implemented the pipeline installation project, which deprived them of access to irrigation water for a period of time, is barred by the discretionary function exception to the FTCA. The court agrees.

The FTCA provides that the United States shall be held liable in tort "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. It thus waives the government's sovereign immunity from suit. But the FTCA also contains several exceptions to this waiver of immunity. 28 U.S.C. § 2680. Relevant to this dispute is the discretionary function exception, which provides that the government has not waived its immunity from claims brought "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense* (*Varig Airlines*), 467 U.S. 797, 808 (1984).

To determine whether the discretionary function exception applies to a case brought under the FTCA, the Supreme Court, in *Berkovitz by Berkovitz v. United States*, 486 U.S. 531 (1988), articulated a two-part test. First, the disputed conduct must have been discretionary in nature. *Berkovitz*, 486 U.S. at 536. "[T]he discretionary function exception will not apply when a federal

statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* Second, the discretionary conduct must be susceptible to policy analysis. *Id.* at 536–37. "Because the discretionary function exception is jurisdictional, the burden is on [the plaintiff] to prove that it does not apply." *Hardscrabble Ranch, L.L.C. v. United States*, 840 F.3d 1216, 1220 (10th Cir. 2016).

The plaintiffs effectively concede that the government's decisions regarding the pipeline installation project were discretionary. No statute or regulation required the United States to make a particular choice that caused the plaintiff's temporary loss of access to irrigation water. Thus, the application of the discretionary function exception in this case turns on the second part of the test: whether the government's discretionary decisions were susceptible to policy analysis. Government acts undertaken without the consideration of public policy are not the kind that the discretionary function exception was "designed to shield." *Berkovitz*, 486 U.S. at 536. This limitation on the exception is consistent with Congress's desire to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 536-37 (quoting *Varig Airlines*, 467 U.S. at 814). The discretionary function exception therefore protects "only governmental actions and decisions based on considerations of public policy." *Id.* at 537.

"When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *United States v. Gaubert*, 499 U.S. 315, 324 (1991). Courts, therefore, "should not inquire into the actual state of mind or decisionmaking process of federal officials charged with performing discretionary functions." *Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1135 (10th Cir. 1999). The focus of the inquiry

is on the nature of the actions taken and on whether they are susceptible to policy analysis. *Gaubert*, 499 U.S. at 325.

Some decisions "cannot be said to be based on the purposes that the regulatory regime seeks to accomplish." *Duke v. Dep't of Agric.*, 131 F.3d 1407, 1411 (10th Cir. 1997) (quoting *Gaubert*, 499 U.S. at 325 n.7). For example, a government official may be obligated to drive while performing his duties, and driving clearly requires the exercise of discretion, but driving "can hardly be said to be grounded in regulatory policy." *Id.* at 1411 (quoting *Gaubert*, 499 U.S. at 325 n.7). Negligent driving is therefore generally not protected by the discretionary function exception. Similarly, the government's failure to maintain a lighthouse in good working condition is not protected because this course of conduct does "not involve any permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 538 n. 3 (*citing Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955)).

In this case, the plaintiffs have failed to carry their burden of showing that the government's decisions related to the pipeline project were not grounded in public policy. Clearly, the initial decision to convert the open-air canal to an underground pressurized pipeline was a policy decision. Officials at the BIA and other related government agencies were required to weigh the cost of the project and the potential for interruptions in water delivery during construction against the benefits that it would bring, including enhanced water conservation compared to the existing canal and lateral ditches.

Moreover, the government's decisions during the implementation of the project were also policy-based. The discretionary function exception is not confined to policymaking or planning decisions. It also applies to day-to-day management and operational decisions, so long as these choices are discretionary and susceptible to policy analysis. *Gaubert*, 499 U.S. at 325. Here, the

8

BIA decided to halt the pipeline project pending the endorsement of a Memorandum of Agreement by the Ute Indian Tribe. The delay caused by this decision prevented the United States from finishing Phase 2 of the project before the start of the 2016 irrigation season, resulting in no deliveries of water to Nebeker and the adoption of stop-gap measures to deliver water to Perank that ultimately proved to be inadequate. The plaintiffs have failed to carry their burden of showing that the BIA's choice to halt construction pending the tribe's endorsement of the Memorandum of Agreement was not grounded in policy. Indeed, they make no mention of this decision in their briefing to the court. Moreover, waiting to continue construction until the contract had been signed guaranteed that the BIA enjoyed the legal protections found in the document and ensured that the Ute Indian Tribe consented to the modification of tribal land. These considerations demonstrate that the government's decision to pause construction was policy-based.

The United States' decisions regarding temporary water delivery methods, as well as its decision to delay completion of the laterals until mid-May 2017 in order to accommodate Perank's requested design changes, also involved policy judgments. The government was required to weigh the costs and benefits of these actions in relation to both Perank's access to water and the success of the project as a whole. *See id*. (holding that operational decisions can be protected by the discretionary function exception because they regularly require "judgment as to which of a range of permissible courses is the wisest").

The plaintiffs argue that a Ninth Circuit opinion, *O'Toole v. United States*, 295 F.3d 1029 (9th Cir. 2002), shows that the government's decisions in this case were not subject to policy analysis. In *O'Toole*, the BIA had acquired land that it held in trust for the Shoshone Indian Tribe. *Id.* at 1031. For many decades the BIA maintained irrigation canals located on the land by cleaning out accumulated sediment. *Id.* at 1031–32. But from 1983 through 1998, the BIA neglected to

9

perform any maintenance on the canals, leading to excessive sediment buildup. *Id.* at 10312. In 1989, the BIA contracted with the Shoshone Indian Tribe to maintain the canals. *Id.* However, despite over $300,000 in payments to the tribe from the BIA for this purpose, the tribe failed to perform any maintenance on the canals. *Id.* The BIA's failure to dredge the canals for 15 years caused water to back up and flood private land located up-steam, damaging the private landowner's crops. *Id.* Under these facts, the Ninth Circuit held that the BIA's failure to conduct routine maintenance on the canals for a period of 15 years was "not the kind of policy decision that the discretionary function exception protects." *Id.* at 1036 (citing *Indian Towing*, 350 U.S. 61, which held that the government's failure to maintain a lighthouse that it owned and operated in working condition did not trigger the discretionary function exception).

In this case, however, the damage to the plaintiffs for nonexistent or inadequate deliveries of water was not caused by the government's failure to conduct routine maintenance. The harm was caused by policy choices made during the implementation of a construction project. Accordingly, *O'Toole* is inapposite.

In short, because the government's decisions related to the delivery of water to the plaintiffs during construction of the pipeline were discretionary and subject to policy analysis, the court lacks jurisdiction over this portion of the plaintiffs' negligence claim. The court, therefore, need not resolve the government's alternative argument that it had not waived its sovereign immunity due to the absence of analogous private liability.[2]

---

[2] At oral argument, the United States suggested that the discretionary function exception may not eliminate all liability for the plaintiffs' damages caused by the government's failure to deliver water. The court disagrees. As discussed above, the government's decisions at issue here all related to water delivery and therefore fit within this exception.

## II. GOVERNMENT LIABILITY FOR THE ACTIONS OF EXCAVATION SERVICES

The United States also argues that it is not liable for damage to Perank's on-farm irrigation infrastructure caused by Excavation Services because Excavation Services is an independent contractor. The court agrees.

The FTCA waives sovereign immunity for harms "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). The United States, however, does not assume liability for the negligence of a "contractor." *Id.* § 2671. Interpreting these statutes, courts have held that the United States is not liable for the acts of independent contractors. But if the United States exercises sufficient control over an agent, he or she will be considered a government employee regardless of the label applied. *Logue v. United States*, 412 U.S. 521, 527–28 (1973); *Ohlsen v. United States*, 998 F.3d 1143, 1154, 1155 (10th Cir. 2021).

"The critical determination in distinguishing a federal employee from an independent contractor is the power of the federal government 'to control the detailed physical performance of the contractor.'" *Lilly v. Fieldstone*, 876 F.2d 857, 858 (10th Cir. 1989) (quoting *Logue*, 412 U.S. at 528). "[T]he key inquiry under this control test is whether the Government supervises the day-to-day operations of the individual." *Id.* (citation omitted). Factors considered by courts when applying the control test include:

> (1) the intent of the parties; (2) whether the United States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses her own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

*Id.* at 859.

Resolving all material disputes of fact in favor of the plaintiffs, the evidence cited by the parties shows that the United States designed the proposed Pahcease Pipeline and accepted a bid from Excavation Services, a privately owned general contractor, to install the pipeline. The government periodically made payments to Excavation Services based on invoices that it submitted for labor and materials for the project. Excavation Services carried its own liability insurance and hired subcontractors for the job. Thus, the United States generally controlled the design and the end result of the pipeline project, while Excavation Services was in charge of implementing the project.

The plaintiffs quote language from the deposition of the owner of Excavation Services, arguing that it shows that Excavation Services and its agents were actually government employees. First, the plaintiffs point to the government's directive to Excavation Services to install a temporary 15-inch pipe to Perank's property in the summer of 2016 as a stop-gap measure until the laterals could be finished. The plaintiffs also reference testimony that the United States instructed Excavation Services to repair a ditch on Perank's assignment of land that had overflown. But these occasional modifications to the scope of the work assigned to Excavation Services do not show that the United States supervised its "the day-to-day operations." *See id*. at 858. Second, the plaintiffs quote testimony that the owner of Excavation Services had suggested a change to the initial project plan. He proposed the use of flexible polyurethane pipe through an existing culvert running underneath a road rather than the regular 24-inch PVP pipe. The United States agreed to the suggested plan modification, avoiding the need to dig up the road and replace the pavement. The government's acceptance of a design change suggested by Excavation Services hardly shows that it controlled Excavation Services' daily operations. Quite the opposite, this evidence

demonstrates that Excavation Services exercised autonomy in deciding how to achieve the end result dictated by the United States.

In short, the relevant *Lilly* factors all indicate that Excavation Services was an independent contractor rather than a government employee. The United States controlled the end result, not the manner and method of achieving the result. Additionally, Excavation Services acquired its own liability insurance and hired its own subcontractors. Moreover, there is no evidence to suggest that Excavation Services used the government's equipment or that the United States paid social security taxes for Excavation Services or its subcontractors. Accordingly, Excavation Services was an independent contractor, eliminating any government liability for damage that it caused to Perank's private irrigation infrastructure.

## CONCLUSION

For the above-stated reasons, the court grants summary judgment in favor of the United States on all claims asserted by the plaintiffs.

DATED February 18, 2025.

BY THE COURT

Jill N. Parrish
United States District Court Judge